U.S. DISTRICT COURT
EASTERN DISTRICT
FILED

2013 APR 23 P 12: 00

JON W. SANFILIPPO
CLERK

# The United States District Court

## Eastern District of Wisconsin

| | | |
|---|---|---|
| Robert Johnson, *and* | ) | |
| Charles Johnson | ) | |
| Plaintiffs, | ) | Case No. |
| | ) | |
| VS. | ) | 13-C-0443 |
| | ) | |
| City of Kenosha, | ) | |
| Jeremy Loesch, | ) | |
| Aaron Dillhoff, *and* | ) | |
| Six (6) "Unidentified" John and Jane Doe | ) | |
| Law Enforcement Officers | ) | |
| Defendants. | ) | |

1

## TABLE ON CONTENTS

NATURE OF ACTION………………………………………….……………3

JURISDICTION….…………………………………….……………4

VENUE…….………………………………………….……………4

PARTIES….………………………………………….……………4

    A.  The Plaintiffs….……………………………….…..……………4

    B.  The Defendants….…………………………….…..……………4

FACTUAL ALLEGATIONS….…………………………………...….…5

FIRST CAUSE OF ACTION

        UNREASONABLE SEIZURE (42 U.S.C. § 1983)….……………13

SECOND CAUSE OF ACTION

        UNREASONABLE SEARCH (42 U.S.C. § 1983)….…..…………15

THIRD CAUSE OF ACTION

        CITY OF KENOSHA UNCONSTITUTIONAL POLICY OR

        CUSTOM (42 U.S.C. § 1983)…….………….……….……...……17

FOURTH CAUSE OF ACTION

        CONSPIRACY (42 U.S.C. § 1983)….……..……….……...……19

FIFTH CAUSE OF ACTION

        INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

        (Wisconsin State Law Claim)….……………….……..……...…21

SIXTH CAUSE OF ACTION

        CIVIL CONSPIRACY (Wisconsin State Law Claim)….…………22

SEVENTH CAUSE OF ACTION

        FALSE IMPRISONMENT (Wisconsin State Law Claim)….…..…24

EIGHTH CAUSE OF ACTION

        INVASION OF PRIVACY (Wisconsin State Law Claim)….……25

PRAYER FOR RELIEF…….……..…………………………….……27

## NATURE OF THE CASE

This is a civil rights action for damages arising under 42 U.S.C. 1983, *Bivens* and supplemental Wisconsin state law claims from an unreasonable search and seizure that took place at Plaintiff's residence in Kenosha, Wisconsin.

On November 7, 2012, (8) law enforcement officers, including local Kenosha police officers and U.S. Deputy Marshals, entered Plaintiffs' residence without consent, search warrant or exigent circumstances, under the belief that one of the residents' son was living at the residence. One of the Plaintiffs was advised his son was wanted for questioning regarding an armed robbery case in Illinois and that he had not seen his probation agent.

After been advised that the individual did not live at the residence, Defendants conducted a 90 minute unlawful search of residence, forcibly opening a basement bedroom door of another Plaintiff, who was asleep, and awaken at the sight of law enforcement officers pointing a gun directly at him.

The Plaintiffs in the residence were detained and kept at gun point, while Defendants proceeded to conduct a "full search" of the residence for a 90 minute period. Plaintiffs' were advised they were not free to leave or move.

Plaintiffs' contend, among other things, that the Defendants acted pursuant to an unconstitutional policy or custom, based on the actions of a Supervisory Officer, that was delegated with the final policy making authority relevant to claims at issue in this present action.

As a result, Plaintiffs suffered numerous damages as a direct and proximate result of Defendants' unlawful actions.

3

## JURISIDCTION

1) This action arises under the Fourth and Fourteenth Amendments to the Constitution of the United States; 42 U.S.C. § 1983; and under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)*.

2) Jurisdiction is conferred on this Court by 28 U.S.C. § 1331 and 28 U.S.C. § 1332(a).

3) The Court has personal jurisdiction over the defendants because the alleged incidents occurred with the confines of this court.

4) This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a), because they are part of the same case and controversy described by Plaintiffs' federal claims.

## VENUE

5) Venue is proper in the Eastern District of Wisconsin pursuant to 28 U.S.C. § 1391(b).

## PARTIES

*A. The Plaintiffs*

6) Plaintiff Robert Johnson is a citizen of Wisconsin and resides at 4216 31st avenue, Kenosha, Wisconsin 53144.

7) Plaintiff Charles Johnson is a citizen of Wisconsin and resides at 4216 31st avenue, Kenosha, Wisconsin 53144.

*B. The Defendants*

8) Defendant Aaron Dillhoff, at all times relevant to this action, was acting in a supervisory police officer and/or policymaking role for the Kenosha Police Department, located at 1000 55th Street, Kenosha, Wisconsin 53140. Defendant is an employee of the Kenosha Police Department and resident of the State of Wisconsin and is being sued in his "individual" capacity.

9) Defendant Jeremy Loesch, at all times relevant to this action, was acting in a supervisory Deputy U.S. Marshal and/or policymaking role for the United States Marshals Office, Department of Justice, located at 517 E. Wisconsin Avenue, Milwaukee, Wisconsin 53202, an agency of the United States of America. Defendant Jeremy Loesch is a resident of the State of Wisconsin and is being sued in his "individual" capacity.

10) Defendant City of Kenosha, a municipal corporation and/or political subdivision, duly organized and existing under the laws of the State of Wisconsin, with its principal offices located at 625 52nd Street, in the City of Kenosha, County of Kenosha and State of Wisconsin (53140) and is being sued in its "official" capacity.

## FACTUAL ALLEGATIONS

11) On November 7, 2012, at approximately 8:00 a.m., Plaintiff Robert Johnson, hereinafter referred to as "Robert", was awaken by loud noises, to which he determined was individuals banging on his front window and front door of his residence.

12) Robert proceeded to the front door, barely awake and opened the door and seen (8) eights individuals in plain clothes with their hand guns pointed directly at him.

13) At the time Robert opened the front door; he only witnessed plain clothes individuals and did not see any marked police cars and was not sure who the individuals were.

14) Plaintiff Robert Johnson and Plaintiff Charles Johnson, hereinafter referred to as "Plaintiffs", later determined the individuals to be Kenosha police officers and Deputy U.S. Marshals.

15) Robert was not fully awake and startled at the presence of numerous defendant officers pointing their guns directly at him.

5

16) One of the officers, later identified as Defendant Jeremy Loesch, hereinafter referred to as "Loesch", stated in an excited and hurried tone, "Are you Jamir"?, to which Robert responded by stating, "No, he does not live here".

17) Loesch then stated, "Well, we have reason to believe he lives here and we need to come in and talk to you".

18) Before Robert could respond, Defendant Jeremy Loesch, Defendant Aaron Dillhoff and the remaining unidentified law enforcement officers, hereinafter referred to as "Defendants", immediately started to rush towards the front door entrance, to which Robert responded to by stepping back.

19) Robert stepped back from the front door entrance, as he felt intimidated and threatened by the large presence of armed individuals and did not feel he had a choice.

20) As Robert stepped back, Loesch took control of the door, fully opened it, and allowed the defendants to proceed into the house. The defendants did not identify themselves.

21) As the defendants started to enter, one of the defendants, later identified as Defendant Aaron Dillhoff, hereinafter referred to as "Dillhoff", asked Robert if anyone else was present in the house or if any weapons were present, to which Robert responded by stating that he believed his brother was in a basement bedroom, but was not sure; and that it was no weapons in the home.

22) Thereafter, some of the defendants proceeded to go to the hallways towards the bedrooms and others proceeded towards the kitchen and then to the lower level or basement of the residence.

23) As the defendants proceeded to pass Robert, he noticed small emblems on some of the defendants' jackets that read, "U.S. Marshal".

24) Robert then stated, "Wait a minute, I did not give anyone permission to come into my home" and started to follow one of the officers going towards the bedrooms.

25) At this point, Dillhoff advised Robert he was not free to move and that he needed to stay right where he was standing. He identified himself as a police officer and provided his name at that time.

26) In addition, Loesch identified himself as a "Deputy U.S. Marshal" and provided his name at that time.

27) Dillhoff then stated he would explain everything to Robert. Dillhoff stated they had reliable information to believe Jamir lived at the residence, that Jamir had not seen his probation officer and that he was in a lot of trouble.

28) Dillhoff further advised Robert that it was best that he cooperated with them and provide any information he had about Jamir's whereabouts.

29) Dillhoff further stated they believed Jamir was possibly involved in an armed robbery in Illinois, that he was possibly armed and that was the reason for the Defendants' heavy armed presence and subsequent urgent actions.

30) Robert, for the second time, stated Jamir did not live at the residence and that he has not seen Jamir for a long time. Robert informed Dillhoff and Loesch that they could possibly ask his mother, who lived in Evanston, Illinois.

31) Robert watched as defendant officers went from room to room and he could hear items being moved around, as Loesch and Dillhoff remained in the living room area with Robert.

32) Robert also witnessed defendant officers making "repeated" trips to the bedroom, while reporting back to Loesch and Dillhoff about items they witnessed, and obtaining additional instructions from Dillhoff.

33) On some occasions, Dillhoff proceeded with the defendant officers to the rooms and later returned.

34) Again, Robert advised Loesch and Dillhoff that they did not have any right to enter or search his residence.

35) Loesch responded by stating Jamir was in a lot of trouble, has not reported to his probation agent and that they had the right to look anywhere they needed.

7

36) Plaintiff Charles Johnson, hereinafter referred to as "Charles", was asleep in a bedroom in the basement and was partially dressed.

37) Charles heard numerous individuals in the basement and then heard a loud noise, as one of the defendant officers used a flashlight to hit and forcibly open his closed bedroom door.

38) As a result of the defendants' actions, a puncture mark was left on the bedroom door and the door knob was damaged.

39) Prior to coming into the bedroom, a defendant officer asked Charles if he was "Jamir", to which Charles responded by stating, "no, what the hell is going on?."

40) Thereafter, a female and male defendant officer proceeded into the bedroom with their guns drawn directly at Charles and advised Charles they had a felony search warrant, and that he needed to be immediately escorted to the living room area.

41) The defendants never identified themselves to Charles.

42) The defendant officers escorted Charles from the basement to the living room area and advised him that he was not free to leave or move from where he was standing.

43) Robert and Charles continued to voice their opposition to the defendant officers' entry and search of the residence.

44) Robert continued to reiterate to the defendants that Jamir never lived at the residence and that any information they had that indicated he lived at their residence was not true.

45) Robert asked Dillhoff if they had a "search warrant", to which he responded by stating "no" and that they did not need one, as Jamir was on probation and in a lot of trouble.

46) Robert advised Dillhoff that he was certain they did not have the right to search or enter their residence without consent, to which Dillhoff responded by informing Robert that he was fully aware of all the actions taken by

Defendants in the residence, assured Robert they were following correct procedures, and stated he was a supervisor in charge of the team.

47) According to a public website on the internet by the City of Kenosha, it contains a web page titled, "Kenosha Police Department Policy and Procedure Manual-Searches of Premises with and without a Warrant", which states a Supervisory officer will be delegated with the responsibility of planning, coordinating, assigning officer assignments, working with other law enforcement agencies, and conducting a pre-briefing in the execution of search warrants and/or warrant service. In addition, it states a Supervisory Officer will be ultimately responsible for all aspects of the search and the outcome of the execution of the search.

48) Dillhoff provided his business card to Robert and advised him he was free to come to his office, if he had any additional concerns. Loesch also provided his business card and stated the same.

49) Robert witnessed as defendant officers continued to report to Dillhoff on the status of their searches and one of the defendant officers advised Dillhoff that he observed paperwork in one of the bedrooms that had "Jamir's" name on it. Dillhoff departed with the defendant officer to the bedroom.

50) Charles and Robert remained guarded by two or more defendant officers at all times, with at least one officer having his or her gun drawn and pointed at them during the initial portion of the encounter.

51) At other times, Defendants situated themselves in what appeared to be very guarded positions, while continuing to guard Plaintiffs by maintaining consistent eye contact and leaving at least one hand on their handgun, thereby giving Plaintiffs' the impression that if one false move was made, it could have deadly consequences.

52) The defendants continued to search the residence for 90 minutes, while repeatedly refusing to allow Plaintiffs' the ability to move from where they stood in the living room area.

53) Dillhoff and Loesch repeatedly responded to Robert's subsequent requests to know what specific information they possessed to lead them to believe Jamir lived at the residence or was currently at the residence, by informing Robert that Jamir was on probation, was not in contact with his probation officer and that it was possible he was involved in an armed robbery case in Illinois.

54) While this incident was taking place, Plaintiffs' neighbors and residents in the area started to gather and watch Plaintiff's residence.

55) Plaintiff's sister, Dezerrea Johnson, also stopped by their residence after seeing the heavy presence of law enforcement officers, people gathering near the residence and seeing the front door of the residence wide open.

56) As a defendant officer approached her, Dezerrea informed the officer she was Plaintiff's sister and wanted to know what was going on, to which the officer responded by asking if she knew where Jamir lived or his current whereabouts.

57) Dezerrea advised the officer she has not seen Jamir in a long time, did not know his whereabouts, that she did not believe he lived at Plaintiffs' residence and that she believed he stayed somewhere in Illinois.

58) Dezerrea did not enter the residence and left after 20 minutes.

59) After this incident, Robert and Charles continue to be questioned by their neighbors and residents that live in the area about what took place.

60) Despite Plaintiffs' insistence to their neighbors they did nothing wrong, neighbors continue to believe that Plaintiffs had done something very serious and illegal, due to the large presence of law enforcement officers they witnessed and the long period of time they stayed at the residence.

61) The Plaintiffs had delicate carpet installed throughout the home, including several pieces of designer rugs in selected areas. Plaintiffs always required visitors to their home to remove their shoes in order to protect the carpet and designer rugs.

62) The Defendant officers' repeatedly tracked dirt from the outside, as they went in and out of the home, in addition to repeatedly entering and exiting the rooms during their 90 minute search.

63) The designer rugs were damaged, as the foot marks and dirt could not be removed. In addition, the delicate carpet throughout the home had to be professionally cleaned, but the foot marks could not be fully cleaned.

64) The defendants damaged Charles' bedroom door and door knob, to which had to be replaced.

65) As a direct result of Defendants' actions, Charles is having trouble sleeping at night and has been repeatedly startled and shaken by family members who enter the residence, without his knowledge.

66) For several months after this incident, Charles indicated that he has withdrawn from family members and friends to avoid confrontations.

67) Charles indicates that he now feels a deep distrust against law enforcement, humiliated, and felt his dignity was taken away, as he continues to vividly remember the sight of the female defendant officer who entered his room as he was partially dressed and how he was startled by guns pointed directly at him.

68) Robert, in addition to family members and friends, have been into repeated and sometimes lengthy arguments with Charles concerning a citizen's 2nd amendment right to bear arms to protects themselves from the intrusions by the government, as a result of Defendants' actions.

69) As a direct result of Defendants' actions, Charles indicated that he felt it necessary to withdraw from his family and friends, as he did not appreciate being repeatedly accused of being overly paranoid of the police and how others did not understand how the defendants' actions deeply affected him.

70) In addition, Charles felt insulted that family members have asked him to see a therapist to address the issues he was dealing with and how to cope with them.

11

71) Robert, at the time this complaint took place, was a customer service Manager for the Hertz Corporation at the Chicago O'Hara Airport. His primary job functions were to address and resolve customer complaints.

72) Robert's job performance was rated by the percentage of complaints he could or could not resolve and how many complaints were ultimately registered to the Hertz's corporate office. In addition, he was also consistently rated by each individual customer contact.

73) In addition to the above, Robert was also an independent contractor for a Corporate Research firm and also conducted similar duties.

74) As a result of Defendants' actions, Robert found it very hard to concentrate on customers' issues and has become quick tempered while performing his functions at work. In addition, customers and clients have made complaints regarding their interactions with Robert, further resulting in Robert being counseled for poor performance by his superiors and/or not being able to complete some of his duties at work, as he did prior to Defendants' actions.

75) In addition, Robert withdrew from co-workers and client contacts to avoid confrontations for several months, while trying to cope with the issues he had with Defendants' actions.

76) Co-workers and superiors have advised Robert that his interactions with customers and clients was causing the department's overall customer quality performance goals to suffer.

77) Robert felt it hard to address customer complaints at his job, as he continued to compare his situation with the Defendants' unlawful actions versus what he believed to be trivial customer's complaint issues.

78) Robert sought counseling from his employer to address these ongoing issues.

79) Moreover, Robert withdrew from his fiancé for several months and found it hard to talk with her, while dealing with how he felt about Defendants' action.

80) Prior to Defendants' actions, Robert communicated with his fiancé in Thailand by phone, email and text on a daily basis.

12

81) After Defendants' actions took place, Robert found it hard to continue this same pattern, and communicated far lesser with his fiancé and found it hard continue his relationship with her.

82) As a result of Robert's change, his fiancé felt he was having an affair with someone else in U.S., and thus, further complicated Robert's relationship with his fiancé for months.

83) After the Defendants' left Plaintiff's residence, Plaintiffs observed that items were removed from drawers, closets and cabinets by Defendants and left on the floor and beds. In addition, mattresses and furniture were moved in several rooms and not returned to their original position.

84) Robert saw paperwork from Jamir that was removed from his bedroom drawer and left on the desk stand. Jamir is Robert's son but never lived at the residence at issue in this present action.

<u>FIRST CAUSE OF ACTION</u>

UNREASONABLE SEIZURE (42 U.S.C. § 1983)

85) Plaintiffs incorporate the above mentioned paragraphs 1-84.

86) Defendants unlawfully arrested Plaintiffs without a search warrant and without probable cause and/or without valid and sufficient grounds to reasonably believe Plaintiffs had committed, was committing, or intended to commit a crime, and Plaintiffs were unlawfully detained by Defendants at gun point (and/or, perceived gun point at times) for 90 minutes in their residence without a sufficient basis or justification in law.

87) Under the facts then available, the Defendants did not have an objective, good faith belief that Plaintiffs were guilty of or would be found guilty of any offense, and said Defendants acted negligently, intentionally, and/or recklessly in making such arrest and undertaking said lengthy detention.

88) Plaintiffs' arrest and detention was made and conducted under the color of state law and Defendants acted individually and in concert and under the color of actual or apparent authority purportedly conferred upon the

Defendants as police officers for the City of Kenosha and as Deputy U.S. Marshals for the State of Wisconsin.

89) Plaintiffs' arrest and detention were unlawful and unjustified, and in violation and deprivation of Plaintiffs' civil rights, liberties, privileges, and immunities granted to Plaintiffs under the laws of the United States, including the right to free from unreasonable and unwarranted searches, seizures, and arrest under the Fourth Amendment of the United States Constitution, and Plaintiffs' right to due process of law under the Fourteen Amendment of the United States Constitution.

90) As of result of Defendants' actions, Plaintiffs have suffered material losses, harm, injuries, and damages arising as a direct and proximate result of the aforementioned unlawful arrest and detention, including without limitation, Plaintiff's deprivation of liberty and loss of personal freedom, physical harm, emotional trauma, loss of privacy, irreparable harm to their reputations, and mental injuries, lost wages, personal property losses, out of pocket expenses, attorney fees and costs, and all in such amounts to be established by Plaintiffs in accordance with proof.

91) Plaintiffs did not in any manner procure or consent to their arrest or detention, and did nothing to cause, invite, provoke, or aggravate the aforementioned injuries and damages, whether through alleged negligence, obstructive misconduct, or otherwise.

92) In addition to the foregoing losses and damages, Plaintiffs have suffered and reasonably expects to continue to suffer from the loss of and damage to their personal reputation and standing in the community, including humiliation and public ridicule, and emotional distress, all arising as a consequence of and as a direct and proximate result of said unlawful arrest and detention.

<u>SECOND CAUSE OF ACTION</u>

UNREASONABLE SEARCH (42 U.S.C. § 1983)

93) Plaintiffs incorporate the above mentioned paragraphs 1-92.

14

94) Defendants entered Plaintiffs' residence without consent, without a search warrant or exigent circumstances. The facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality, did not warrant a reasonable belief that Jamir lived at the Plaintiffs' residence or that Jamir was at the residence at the time of entry.

95) Even if Defendants' had consent or legal authority to enter Plaintiff's residence, their unlawful search exceeded the boundaries of a "protective sweep" safety search. It was not a "quick and limited search of the premises", nor was it limited in duration, lasting "no longer than is necessary to address the reasonable suspicion of danger".

96) The Defendants searched the residence for 90 minutes. The Defendants made repeated trips throughout all areas of home, even after making an initial sweep of the residence.

97) The Defendants searched inside drawers, cabinets and closets and removed items from these areas, although they had no specific and articulable belief that someone might be hiding in these small spaces. Defendants were not entitled to a full search of the Plaintiffs' home under any set of circumstances.

98) Defendants' actions of detaining Plaintiffs' at gun point for 90 minutes and forcibly opening a bedroom door, while Plaintiffs was asleep, not identifying themselves, was not objectively reasonable, excessive and violated Plaintiff's rights.

99) Defendants' unreasonable search of Plaintiffs' residence was conducted under color of state law and Defendants acted individually and in concert and under the color of actual or apparent authority purportedly conferred upon the Defendants as police officers for the City of Kenosha and Deputy U.S. Marshals for the State of Wisconsin.

100)   Defendants' unreasonable search of Plaintiffs 'residence was unlawful and unjustified, and in violation and deprivation of Plaintiffs' civil rights, liberties, privileges, and immunities granted to Plaintiffs under the laws of the United States, including the right to free from unreasonable and unwarranted

searches, seizures, and arrest under the Fourth Amendment of the United States Constitution, and Plaintiffs' right to due process of law under the Fourteen Amendment of the United States Constitution.

101)    As of result of Defendants' actions, Plaintiffs have suffered material losses, harm, injuries, and damages arising as a direct and proximate result of the aforementioned unlawful arrest and detention, including without limitation, Plaintiff's deprivation of liberty and loss of personal freedom, physical harm, emotional trauma, loss of privacy, irreparable harm to their reputations, and mental injuries, lost wages, personal property losses, out of pocket expenses, attorney fees and costs, and all in such amounts to be established by Plaintiffs in accordance with proof.

102)    Plaintiffs did not in any manner procure or consent to the search of their residence, and did nothing to cause, invite, provoke, or aggravate the aforementioned injuries and damages, whether through alleged negligence, obstructive misconduct, or otherwise.

103)    In addition to the foregoing losses and damages, Plaintiffs has suffered and reasonably expects to continue to suffer from the loss of and damage to their personal reputation and standing in the community, including humiliation and public ridicule, and emotional distress, all arising as a consequence of and as a direct and proximate result of said unlawful search of the residence.

<u>THIRD CAUSE OF ACTION</u>

CITY OF KENOSHA UNCONSTITUTIONAL POLICY OR CUSTOM (42 U.S.C. § 1983)

104)    Plaintiffs incorporate the above mentioned paragraphs 1-103.

105)    Defendant, City of Kenosha, maintains an unconstitutional policy or custom of conducting unlawful entries into residences without legal justification, arresting citizens without a legal basis and conducting searches without a legal basis.

16

106) Plaintiffs contend the unconstitutional policy or custom can be established thru acts of a Supervisory Officer, whose edicts or acts may fairly be said to represent official policy.

107) Defendant Dillhoff, acting in his official capacity, as the Supervisory officer at the scene, was delegated with the final policymaking authority sufficient to impose municipal liability upon the City of Kenosha under 42 U.S.C. § 1983.

108) Dillhoff made verbal statements to Plaintiffs that he was a Supervisory Officer in charge of the team of the Defendant officers that conducted said unlawful acts.

109) In further evidence of Dillhoff's Supervisory role, Defendant officers repeatedly reported to him at the scene, as they made repeated trips from the living room area to different rooms in the residence.

110) Dillhoff was advised of the status of the searches by the Defendant officers and Dillhoff continued to provide ongoing instructions to Defendant officers on how to further proceed.

111) In addition, the City of Kenosha publishes a public website on the internet of the Kenosha Police Department's written official policy, that delegates Dillhoff, as a Supervisory officer, with the authority and responsibility of planning, coordinating, assigning officer assignments, working with other law enforcement agencies and conducting pre- briefings in the execution of the search warrant and/or warrant service.

112) The aforementioned written policy indicates it is for searches of premises with and without a warrant. In addition, it reiterates the Supervisory Officer will be ultimately responsible for all aspects of the search and the outcome of the execution of the search.

113) At various times during the search, Dillhoff, not only supervised the Defendant officers, but also "participated" and "assisted" with the illegal search, false arrest and extended detention of Plaintiffs.

114) As such, Dillhoff acted knowingly, with reckless disregard or deliberate indifference to the likelihood that his decisions would result in further violations of Plaintiffs' constitutional rights.

115) At all times relevant to this action, Dillhoff, as a Supervisory Officer, was responsible for the conduct of his subordinates and was personally involved in formulating, assisting, conducting and directing an unconstitutional policy.

116) Based on Dillhoff's verbal statement to Plaintiffs and City of Kenosha's police department written official policy, in effect at all times relevant to this action, Dillhoff did not merely exercise discretion but rather acted as a final policymaker within the context of this case and remained the final policy making authority on all claims at issue here.

117) It would have been plainly obvious to a reasonable Supervisory official or policymaker that such conduct would lead to deprivations of Plaintiff's constitutional rights.

118) As a direct and foreseeable consequence of these policy decisions, Plaintiffs' were deprived of their rights under the Fourth and Fourteenth Amendments to the United States Constitution.

119) As of result of Defendants' actions, Plaintiffs have suffered material losses, harm, injuries, and damages arising as a direct and proximate result of the aforementioned unlawful arrest and detention policy or custom, including without limitation, Plaintiff's deprivation of liberty and loss of personal freedom, physical harm, emotional trauma, loss of privacy, irreparable harm to their reputations, and mental injuries, lost wages, personal property losses, out of pocket expenses, attorney fees and costs, and all in such amounts to be established by Plaintiffs in accordance with proof.

120) Plaintiffs did not in any manner procure or consent to the search of their residence, and did nothing to cause, invite, provoke, or aggravate the aforementioned injuries and damages, whether through alleged negligence, obstructive misconduct, or otherwise.

18

121)   In addition to the foregoing losses and damages, Plaintiffs has suffered and reasonably expects to continue to suffer from the loss of and damage to their personal reputation and standing in the community, including humiliation and public ridicule, and emotional distress, all arising as a consequence of and as a direct and proximate result of said unlawful search of the residence.

FOURTH CAUSE OF ACTION

CONSPIRACY (42 U.S.C. § 1983)

122)   Plaintiffs incorporate the above mentioned paragraphs 1-121.

123)   According to the official written policy by the Kenosha police department, that was relevant to this present action, it dictates that Supervisory officers will be delegated with the authority to complete all aspects of the search at Plaintiffs' residence and that a pre-briefing will take place with all officers and/or other law enforcement agencies in executing the search.

124)   In addition, Dillhoff admitted to Robert that he was in charge of the team and was fully aware of all actions completed by Defendants at the residence and stated their actions were proper.

125)   Based on Dillhoff verbal admission and the City of Kenosha's written policy, it can be reasonably assumed that a meeting took place with all of the Defendants, prior to their actions at Plaintiffs' residence.

126)   Moreover, given the collective unlawful actions that took place at Plaintiffs' residence in concert, it could be reasonably assumed their actions were discussed and agreed upon.

127)   Defendants, acting individually and in concert, unlawfully entered the Plaintiffs' residence without consent or identifying themselves, at gun point, presented a large presence of law enforcement and conducted such acts in a threatening and intimidating manner.

128)   Defendants 'entered Charles private closed bedroom, while he was partially dressed and barely awake, made a loud noise to forcibly open the

bedroom door, failed to announce or identify themselves, placed Charles at gunpoint and arrested him.

129)   Defendants' continued to keep Plaintiffs 'under arrest and detained for a lengthy period of 90 minutes, without justification or legal basis.

130)   Defendants' conducted illegal searches in the private enclosed areas of the residence, while clearly exceeding any type of "protective sweep" for safety reasons, and unnecessarily damaged Plaintiffs' bedroom door, door knob, designer rug pieces and carpet.

131)   In combination with the conduct described above, these actions evidenced a pattern of extreme and outrageous behavior with the intent to cause Plaintiffs to suffer severe emotional distress.

132)   Defendants' conduct also had the direct and foreseeable consequence of making Plaintiffs appear as violent criminals.

133)   The large presence of law enforcement officers and the lengthy period they stayed at Plaintiffs' residence, would lead any observing neighbors, as in this case, to believe Plaintiffs' were involved in obvious and serious illegal activity.

134)   As of result of Defendants' actions, Plaintiffs have suffered material losses, harm, injuries, and damages arising as a direct and proximate result of the aforementioned unlawful arrest and detention, including without limitation, Plaintiff's deprivation of liberty and loss of personal freedom, physical harm, emotional trauma, loss of privacy, irreparable harm to their reputations, and mental injuries, lost wages, personal property losses, out of pocket expenses, attorney fees and costs, and all in such amounts to be established by Plaintiffs in accordance with proof.

135)   Plaintiffs did not in any manner procure or consent to the search of their residence, and did nothing to cause, invite, provoke, or aggravate the aforementioned injuries and damages, whether through alleged negligence, obstructive misconduct, or otherwise.

136) In addition to the foregoing losses and damages, Plaintiffs has suffered and reasonably expects to continue to suffer from the loss of and damage to their personal reputation and standing in the community, including humiliation and public ridicule, and emotional distress, all arising as a consequence of and as a direct and proximate result of said unlawful search of the residence.

## FIFTH CAUSE OF ACTION

INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (Wisconsin State Law Claim)

137) Plaintiffs incorporate the above mentioned paragraphs 1-136.

138) Defendants acting individually and in concert, unlawfully entered the Plaintiffs' residence without consent or identifying themselves, at gun point, presented a large presence of law enforcement and conducted such acts in a threatening and intimidating manner.

139) Defendants 'entered Charles private bedroom while he was partially dressed and barely awake, made a loud noise after forcibly opening the closed bedroom door, failed to announce or identify themselves, placed Charles at gunpoint and arrested him.

140) Defendants' continued to keep Plaintiffs 'under arrest and detained for a lengthy period of 90 minutes, without justification or legal basis.

141) Defendants' conducted illegal searches in the private enclosed areas in the residences, clearly exceeding any type of "protective sweep" search for safety reasons, and unnecessarily damaged Plaintiffs' bedroom door, door knob, designer rug pieces and carpet.

142) As a direct result of Defendants' actions, Plaintiffs' relationships with their family members, friends, co-workers and employers were extremely disabled due to Plaintiffs' continued emotional distress.

143) In combination with conduct described above, these actions evidenced a pattern of extreme and outrageous behavior with the intent to cause Plaintiff to suffer severe emotional distress.

144) Defendants' conduct had the direct and foreseeable consequence of making Plaintiffs appear as violent criminals, as neighbors and residents of the neighborhood believed the large presence of law enforcement officers and the lengthy period they stayed at Plaintiffs' residence, was due to obvious and serious illegal activity.

145) As a result of Defendants' intentional and outrageous conduct, Plaintiffs have suffered and continue to suffer from emotional and mental conditions generally recognized and diagnosed by trained professionals.

146) As a direct and foreseeable consequence of those conditions, Plaintiffs have suffered, and continue to suffer, disabling emotional, mental, physical harm, and irreparable harm to their reputations.

<u>SIXTH CAUSE OF ACTION</u>

CIVIL CONSPIRACY (Wisconsin State Law Claim)

147) Plaintiffs incorporate the above mentioned paragraphs 1-146.

148) According to the official written policy by the Kenosha police department, that was relevant to this present action, it dictates that Supervisory officers will be delegated with the authority to complete all aspects of the search at Plaintiffs' residence and that a pre-briefing will take place with all officers and/or other law enforcement agencies in executing the search.

149) In addition, Dillhoff admitted to Robert that he was in charge of the team and was fully aware of all actions completed by Defendants at the residence and stated their actions were proper.

150) Based on Dillhoff verbal admission and the City of Kenosha's written policy, it can be reasonably assumed that a meeting took place with all of the Defendants, prior to their actions at Plaintiffs' residence.

151) Moreover, given the collective unlawful actions that took place at Plaintiffs' residence in concert, it could be reasonably assumed their actions were discussed and agreed upon.

22

152)  Defendants acting individually and in concert, unlawfully entered the Plaintiffs' residence without consent or announcing or identifying themselves, at gun point, presented a large presence of law enforcement and conducted such acts in a threatening and intimidating manner.

153)  Defendants 'entered Charles private bedroom, while he was partially dressed and barely awake, made a loud noise to forcibly open the closed bedroom door, failed to announce or identify themselves, placed Charles at gunpoint and arrested him.

154)  Defendants' continued to keep Plaintiffs 'under arrest and detained for a lengthy period of 90 minutes, without justification or legal basis.

155)  Defendants' conducted illegal searches of the private enclosed areas of the residence, while clearly exceeding any type of "protective sweep" search for safety reasons, unnecessarily damaged Plaintiffs' bedroom door, door knob, designer rug pieces and carpet.

156)  In combination with conduct described above, these actions evidenced a pattern of extreme and outrageous behavior with the intent to cause Plaintiffs to suffer severe emotional distress.

157)  Defendants' conduct had the direct and foreseeable consequence of making Plaintiffs appear as violent criminals, as neighbors and residents of the neighborhood believed the large presence of law enforcement officers and the lengthy period they stayed at Plaintiffs' residence was due to obvious and serious illegal activity.

158)  As of result of Defendants' actions, Plaintiffs have suffered material losses, harm, injuries, and damages arising as a direct and proximate result of the aforementioned unlawful arrest and detention, including without limitation, Plaintiff's deprivation of liberty and loss of personal freedom, physical harm, emotional trauma, loss of privacy, irreparable harm to their reputations, and mental injuries, lost wages, personal property losses, out of pocket expenses, attorney fees and costs, and all in such amounts to be established by Plaintiffs in accordance with proof.

159) Plaintiffs did not in any manner procure or consent to the search of their residence, and did nothing to cause, invite, provoke, or aggravate the aforementioned injuries and damages, whether through alleged negligence, obstructive misconduct, or otherwise.

160) In addition to the foregoing losses and damages, Plaintiffs has suffered and reasonably expects to continue to suffer from the loss of and damage to their personal reputation and standing in the community, including humiliation and public ridicule, and emotional distress, all arising as a consequence of and as a direct and proximate result of said unlawful search of the residence.

<u>SEVENTH CAUSE OF ACTION</u>

FALSE IMPRISONMENT (Wisconsin State Law Claim)

161) Plaintiffs incorporate the above mentioned paragraphs 1-160.

162) Defendants detained Robert in the living room for 90 minutes and informed Robert he was not free to leave or move.

163) In addition, Robert was held at gun point initially and at perceived gun point for the remaining period of time.

164) Defendants ordered Charles to leave his basement bedroom, at gun point, and escorted him to the living room area and then advised Charles he was not free to leave or move.

165) In addition, Charles was held at gun point initially and at perceived gun point for the remaining period of time.

166) Defendants did not have any legal basis or justification to detain Plaintiffs for the entire 90 minutes period.

167) As of result of Defendants' actions, Plaintiffs have suffered material losses, harm, injuries, and damages arising as a direct and proximate result of the aforementioned unlawful arrest and detention, including without limitation, Plaintiff's deprivation of liberty and loss of personal freedom, physical harm, emotional trauma, loss of privacy, irreparable harm to their reputations, and mental injuries, lost wages, personal property losses, out of

24

pocket expenses, attorney fees and costs, and all in such amounts to be established by Plaintiffs in accordance with proof.

168) Plaintiffs did not in any manner procure or consent to the search of their residence, and did nothing to cause, invite, provoke, or aggravate the aforementioned injuries and damages, whether through alleged negligence, obstructive misconduct, or otherwise.

169) In addition to the foregoing losses and damages, Plaintiffs has suffered and reasonably expects to continue to suffer from the loss of and damage to their personal reputation and standing in the community, including humiliation and public ridicule, and emotional distress, all arising as a consequence of and as a direct and proximate result of said unlawful search of the residence.

## EIGHTH CAUSE OF ACTION

INVASION OF PRIVACY (Wisconsin State Law Claim)

170) Plaintiffs incorporate above mentioned paragraphs 1-169.

171) Defendants acting individually and in concert, unlawfully entered the Plaintiffs' residence without consent, without announcing or identifying themselves, at gun point, presented a large presence of law enforcement and conducted such acts in a threatening and intimidating manner.

172) Defendants 'entered Charles private bedroom, while he was partially dressed and barely awake, made a loud noise to forcibly open his closed bedroom door, failed to announce or identify themselves, placed Charles at gunpoint and arrested him.

173) As of result of Defendants' actions, Plaintiffs have suffered material losses, harm, injuries, and damages arising as a direct and proximate result of the aforementioned unlawful arrest and detention, including without limitation, Plaintiff's deprivation of liberty and loss of personal freedom, physical harm, emotional trauma, loss of privacy, irreparable harm to their reputations, and mental injuries, lost wages, personal property losses, out of

25

pocket expenses, attorney fees and costs, and all in such amounts to be established by Plaintiffs in accordance with proof.

174)    Plaintiffs did not in any manner procure or consent to the search of their residence, and did nothing to cause, invite, provoke, or aggravate the aforementioned injuries and damages, whether through alleged negligence, obstructive misconduct, or otherwise.

175)    In addition to the foregoing losses and damages, Plaintiffs has suffered and reasonably expects to continue to suffer from the loss of and damage to their personal reputation and standing in the community, including humiliation and public ridicule, and emotional distress, all arising as a consequence of and as a direct and proximate result of said unlawful search of the residence.

176)    By this complaint, Plaintiffs seeks compensation for and the full recovery of all monetary losses, damages, injuries, costs and expenses incurred and suffered by Plaintiffs, arising out of and/or resulting from the Defendants' violation of Plaintiff's federal constitutional rights and freedoms as alleged above.

<u>PRAYER FOR RELIEF</u>

*Wherefore*, Plaintiffs requests and demands judgment be entered against the Defendants in excess of $1,000,000.00, jointly and severally, to redress the injuries proximately and directly caused by Defendants' conduct, as stated in Paragraphs 1-176 above, and as follows:

A. For all actual, compensatory, and general pecuniary damages and losses suffered by Plaintiffs, in accordance with proof;

B. For all special damages and reasonably foreseeable consequential economic damages suffered by Plaintiffs, in accordance with proof and as allowed or permitted by applicable law;

26

C. For the costs and expenses of pursuing this action, including the recovery of reasonable attorney's fees, costs, and expenses incurred by Plaintiffs, as allowed or permitted by applicable law;

D. For punitive and/or exemplary damages as may be appropriate under the circumstances and as allowed or permitted by applicable law;

E. For such injunctive and/or declaratory and/or other equitable relief as may be appropriate or necessary under the circumstances; and

F. For all such other and further relief to which Plaintiffs is entitled and as is just and proper in the premises.


## JURY DEMAND


Plaintiffs hereby request a trial by jury on all claims so triable.


I, (Plaintiffs), declare under penalty of perjury that the foregoing is true and correct. Complaint signed this 23rd day of April, 2013.

By: _____

Robert Johnson, *Pro Se*

4216 31st Avenue

Kenosha, Wisconsin 53144

(262) 818-2735

Email: mrrobj@live.com

By: _____

Charles Johnson, *Pro Se*

4216 31st Avenue

Kenosha, Wisconsin 53144

(262) 818-2735

27